United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 7, 1997 Decided January 13, 1998 

 No. 96-1334

 Montrose Chemical Corporation of California, 

 Petitioner

 v.

 Environmental Protection Agency, 

 Respondent

 Consolidated with 

 Nos. 96-1341, 96-1350, 96-1355, 96-1371

 On Petitions for Review of an Order of the 

 Environmental Protection Agency

 Karl S. Lytz argued the cause for petitioners, with whom 
Paul B. Galvani, Frank Rothman, Jose R. Allen, Charles B. 
Cohler and Jeffrey F. Silverman were on the joint briefs. 
David M. Rosenberg-Wohl entered an appearance.


 H. Michael Semler, Attorney, U.S. Department of Justice, 
argued the cause for respondent, with whom Lois J. Schiffer, 
Assistant Attorney General, and Alan Carpien, Attorney, 
Environmental Protection Agency, were on the brief.

 Before: Ginsburg, Sentelle and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: The issue presented is whether two 
internal memoranda of the Environmental Protection Agency 
("EPA") constitute a regulation reviewable by this court 
under the Comprehensive Environmental Response, Compen-
sation, and Liability Act ("CERCLA"). Under CERCLA, 
EPA must maintain and revise annually the National Priori-
ties List ("NPL") of hazardous waste sites most in need of 
long-term remedial attention, see 42 U.S.C. s 9605(a)(8)(B) 
(1988); 40 C.F.R. s 300.5 (1996), but can change the list only 
through notice-and-comment rulemaking. See 42 U.S.C. 
s 9605(a). In two July 1996 memoranda, EPA announced 
that it would manage response activities at a preexisting NPL 
site, the Montrose Chemical National Priorities List Super-
fund Site ("Montrose NPL Site"), in conjunction with an 
investigation and response activities at a separate unlisted 
offshore area, the Palos Verdes Shelf ("the Shelf"). Petition-
ers contend that this decision constitutes a regulation amend-
ing the NPL, without the required notice-and-comment proce-
dures, and request the court to vacate those memoranda and 
to order the agency to cease taking actions inconsistent with 
CERCLA's rulemaking procedures. While conceding that 
these memoranda could not validly amend the NPL, EPA 
maintains that it never sought to amend the NPL or engage 
in rulemaking and, thus, this court is without jurisdiction to 
review the memoranda under CERCLA. See id. s 9613(a), 
(h) (1988). We agree with both parties that the memoranda 
could have no effect on the NPL, and with the agency that 
the memoranda do not constitute a regulation amending the 
NPL; hence, we dismiss the petitions for lack of jurisdiction.


 I.

 Our consideration of the petitions for review focuses on 
three sections of CERCLA: sections 104, 105, and 113. 
Section 105 establishes the list of the national priorities for 
hazardous waste remedial actions. See 42 U.S.C. 
s 9605(a)(8)(B); see also 40 C.F.R. ss 300.5, .425(b) (1996). 
The sites on the list are presumed to be those most in need of 
remedial attention, and "listing drastically increases the 
chances of costly activity" and liability for the potentially 
responsible parties. Mead Corp. v. Browner, 100 F.3d 152, 
155 (D.C. Cir. 1996). Consequently, under section 105, EPA 
can add a site to the NPL only after providing interested 
parties notice and an opportunity for comment. See 42 
U.S.C. s 9605(a).

 At the same time, the actual substantive impact, as distinct 
from practical impact,1 of listing is limited. EPA is under no 
obligation to take actions with regard to listed sites, see 40 
C.F.R. s 300.425(b)(2); Mead, 100 F.3d at 155, and section 
104 of CERCLA makes clear that EPA may take response 
actions at hazardous waste sites regardless of whether they 
are listed on the NPL. See 42 U.S.C. s 9604(a)(1) (1988). 
EPA can always take response actions that neither demand 
more than $2 million from the Superfund 2 nor last longer 
than one year at either listed or unlisted sites. See id. 
s 9604(c)(1); 40 C.F.R. ss 300.415(b)(5), .425(b)(1).3 The lim-

__________
 1 See Mead, 100 F.3d at 155; Board of Regents of Univ. of 
Wash. v. EPA, 86 F.3d 1214, 1217 (D.C. Cir. 1996).

 2 The Superfund is the general federal fund for hazardous 
waste management under CERCLA. See 42 U.S.C. s 9611 (1988 & 
Supp. V 1993).

 3 There are two kinds of response actions: "removal actions" 
and "remedial actions." See 42 U.S.C. s 9604(a)(1). The category 
of "removal actions" includes a broad range of monitoring, investi-
gative, and cleanup activities "as may be necessary to prevent, 
minimize, or mitigate damage," id. s 9601(23) (1988), while "remedi-
al actions" are more comprehensive actions that are intended as 
permanent remedies, see id. s 9601(24). EPA can take removal 
actions without regard to listing, see 40 C.F.R. s 300.415(b)(5), but 


ited substantive importance of listing is further underscored 
by section 104(d)(4) of CERCLA, which provides that regard-
less of NPL status, "[w]here two or more noncontiguous 
[hazardous waste sites] are reasonably related on the basis of 
geography, or on the basis of the threat, or potential threat to 
the public health or welfare or the environment, the President 
may, in his discretion, treat these related facilities as one for 
purposes of [section 104]." 42 U.S.C. s 9604(d)(4); see also 
id. s 9601(9) (1988). Although this provision does not em-
power EPA 4 to expand preexisting NPL sites without satisfy-
ing CERCLA's procedural and substantive requirements for 
listing new sites, see Mead, 100 F.3d at 155, section 104(d) 
authorizes the agency to take response actions with regard to 
unlisted sites that are "reasonably related" to listed ones, 
within the $2 million and one year limits.

 Section 113(a) of CERCLA governs judicial review of list-
ing decisions, authorizing review of "any regulation" promul-
gated under CERCLA. 42 U.S.C. s 9613(a). The listing of a 
site on the NPL constitutes promulgation of a regulation 
subject to judicial review under this provision. See Washing-
ton State Dep't of Transp. v. EPA, 917 F.2d 1309, 1311 (D.C. 
Cir. 1990). By contrast, section 113(h) of CERCLA bars 
judicial review over EPA investigative activities in anticipa-
tion of rulemaking, with certain exceptions not relevant here. 
See 42 U.S.C. s 9613(h).

__________
can take remedial actions only at sites on the NPL, see id. 
s 300.425(b)(1). All removal actions other than investigative and 
monitoring activities are limited to $2 million from the Superfund 
and one year in length, with exceptions not at issue here, see 42 
U.S.C. s 9604(c)(1); 40 C.F.R. s 300.415(b)(5), whereas there is no 
such limitation on the cost or length of remedial actions, see id. 
s 300.425(b)(2). Thus, EPA generally can take response actions 
(other than investigative and monitoring activities) that cost more 
than $2 million or take longer than a year only at listed sites.

 4 The President has delegated his authority under CERCLA to 
various federal agencies. See 40 C.F.R. s 300.100 (1996).


 II.

 From 1947 through 1982, the Montrose Chemical Corpora-
tion ("Montrose") plant in Torrance, California, manufactured 
the pesticide dichloro-diphenyl trichloroethane ("DDT"). As 
a consequence, EPA asserts, large quantities of DDT contam-
inated the soil, surface water, and groundwater at the plant. 
EPA also claims that the discharge of DDT into the plant's 
wastewater resulted in massive contamination at the waste-
water's point of release: the Palos Verdes Shelf, a large area 
of the ocean floor about 1.5 kilometers off the coast of Los 
Angeles, California. Following an investigation that began in 
1982, on October 15, 1984, EPA proposed listing the immedi-
ate area of the Montrose plant on the NPL. Although EPA 
knew of DDT contamination on the Shelf as well as on the 
plant grounds, the Montrose NPL site as finalized on October 
4, 1989, did not include the Shelf.

 In June 1990, the Department of Justice ("the Depart-
ment") sued Montrose in the United States District Court for 
the Central District of California. The government brought 
two claims under section 107(a) of CERCLA, 42 U.S.C. 
s 9607(a) (1988): first, a claim for natural resource damages 
caused by the contamination of the Shelf; and second, a claim 
for reimbursement of the agency's response costs in connec-
tion with the Montrose NPL site. See United States v. 
Montrose Chem. Corp., 883 F. Supp. 1396, 1397 (C.D. Cal. 
1995), rev'd sub nom. California v. Montrose Chem. Corp., 
104 F.3d 1507 (9th Cir.1997). The district court dismissed 
the natural resource damages claim on statute-of-limitations 
grounds, see id. at 1406-07, and the Department appealed.

 In an effort to address the statute-of-limitations problem, 
the Department forwarded to the Ninth Circuit the two 
internal EPA memoranda that are the focus of the current 
petitions for review. The Department claimed that these 
memoranda, which EPA had approved that very day, "ex-
pand[ed] the area of EPA response activity with respect to 
the Montrose [NPL site] to include the Palos Verdes shelf." 
Further, the Department argued that, if the Shelf was then 
on the NPL, a different statute of limitations would apply and 


the district court's ground for dismissal was invalid. See 42 
U.S.C. s 9613(g)(1); Montrose Chem. Corp., 883 F. Supp. at 
1398. The Ninth Circuit did not, however, mention the 
memoranda in concluding for other reasons that the statute of 
limitations had not expired, and thus reversing the district 
court's dismissal of the natural resource damages claim. See 
Montrose Chem. Corp., 104 F.3d at 1512-14.

 The effect, if any, of the memoranda on the NPL is unclear. 
These two documents, dated July 9, 1996, and approved the 
next day, were entitled "Engineering Evaluation and Cost 
Analysis Approval Memorandum for Addressing Contaminat-
ed Marine Sediments on the Palos Verdes Shelf" and "Man-
agement of EPA Superfund Response Activities as Part of 
EPA Response Actions Taken in Connection With the Mont-
rose Chemical NPL Site." In the former, EPA described the 
contamination on the Shelf and recommended that the agency 
initiate an engineering evaluation and cost analysis, a study to 
determine the need for and feasibility of future response 
actions. In the latter, EPA recommended that the engineer-
ing and cost study and other response activities concerning 
the Shelf be managed "as part of the response activities being 
conducted by EPA in connection with the Montrose [NPL] 
Site." The latter memorandum did not specify what joint 
management would entail, explaining only that: "Manage-
ment of EPA's response activities with respect to the Palos 
Verdes shelf contamination as part of EPA's response activi-
ties for the Montrose NPL Site will help to facilitate EPA 
administrative, funding, staffing and enforcement activities."

 Although EPA did not explicitly announce an amendment 
to the NPL in either memorandum, EPA took a number of 
actions that implied that it thought the Shelf had become part 
of the Montrose NPL site. In an appendix to the joint 
management memorandum, EPA called the Shelf the "Palos 
Verdes Shelf Operable Unit" of the "MONTROSE CHEMI-
CAL CORPORATION SUPERFUND SITE." In a press 
conference on July 10, 1996, EPA announced that the Mont-
rose NPL site had been expanded to include the Shelf. 
Although EPA stipulated for the purposes of the district 
court litigation in California that the Montrose NPL site did 


not include the Shelf, an internal agency document soon 
thereafter referred to "EPA's expansion of the Montrose 
NPL site to include the Palos Verdes Shelf" without question-
ing that such expansion had occurred. And in an earlier 
consent decree in the Ninth Circuit litigation, EPA settled 
response cost claims based on the assumption that the site 
did include the Shelf.

 Many of these references appear inconsistent with EPA's 
position before this court that it never intended to amend the 
NPL in its July 1996 memoranda. At oral argument, howev-
er, counsel for EPA explained that EPA took the position 
from 1989 onward that it could consider the Shelf effectively 
to be part of the Montrose NPL site, and it only began to 
question that conclusion when this court decided Mead Corp. 
v. Browner on November 12, 1996. In Mead, the court 
invalidated EPA's "aggregation policy," whereby the agency 
listed noncontiguous parcels as a single NPL site under 
certain circumstances even when EPA had not satisfied 
CERCLA's procedural and substantive requirements for list-
ing as to the individual parcels. See Mead, 100 F.3d at 154-
57. Thus, EPA maintains that prior to Mead, it acted as if 
the Shelf was part of the Montrose NPL site not because of 
the two memoranda, but because of its aggregation policy. 
After Mead, the agency continues, it realized that the Shelf 
could not be part of the site without a separate notice-and-
comment rulemaking process, and EPA has accordingly initi-
ated a rulemaking proceeding to add the Shelf to the NPL in 
accordance with CERCLA's requirements. See National Pri-
orities List for Uncontrolled Hazardous Waste Sites, Pro-
posed Rule, 62 Fed. Reg. 44,430, 44,430 (1997).

 Notwithstanding EPA's explanations for its actions, the 
inconsistency of the agency's approach has caused under-
standable concern among interested parties. Montrose and 
others 5 petition this court for review of EPA's alleged deci-
sion to expand the Montrose NPL site to include the Shelf.

__________
 5 Chris-Craft Industries, Inc., Rhone-Poulenc Inc., Atkemix 
Thirty-Seven, Inc., Stauffer Management Co., Zeneca Holdings 
Inc., and Westinghouse Electric Corp. also sought review. Their 


 III.

 Concessions by the parties establish that there is a single 
dispositive issue before us. If there was a "regulation" within 
the meaning of section 113(a) of CERCLA, EPA does not 
dispute that it was improper and invalid.6 If there was no 
such regulation, Montrose does not dispute that the court 
would be without jurisdiction to review any agency action 
because, to the extent that EPA has not enacted a regulation, 
its actions are merely response actions over which section 
113(h) specifically bars judicial review. See 42 U.S.C. 
s 9613(h). Of course, the court has jurisdiction to determine 
whether there is jurisdiction to make a ruling on the merits, 
see In re Thornburgh, 869 F.2d 1503, 1510 (D.C. Cir. 1989), 
and although EPA maintains that its memoranda did not 
constitute a regulation subject to review, that is an issue for 
us to decide. See American Portland Cement Alliance v. 
EPA, 101 F.3d 772, 776 (D.C. Cir. 1996).

 The record does not provide a definitive answer to the 
factual question of EPA's intent. Although conceding that 
EPA's decision in the engineering and cost analysis memo-
randum to begin taking response actions at the Shelf was 
unobjectionable,7 Montrose contends that the decision in the 
second memorandum to manage the Shelf jointly with the 
Montrose NPL site was an improper rulemaking intended to 

__________
petitions have been consolidated with Montrose's, and we refer to 
petitioners collectively as Montrose.

 6 Montrose contends that if there was a regulation, it did not 
satisfy the procedural or substantive requirements for an addition 
to the NPL, and was arbitrary and capricious as well. Given EPA's 
concession that it did not follow the proper procedures for amend-
ing the NPL, there is no need to address these arguments.

 7 The first memorandum, notably, only proposes further inves-
tigative action for the purpose of determining what the proper 
future course of action would be; the memorandum even states that 
"EPA will compare the feasibility of [various] cleanup alternatives 
to the no-action option." EPA emphasizes that "[n]othing in the 
... memorandum suggests that EPA was seeking to amend the 
NPL or otherwise engage in rulemaking."


put the Shelf on the NPL. Montrose points to the agency's 
contemporaneous and subsequent actions that corroborate 
this conclusion and further contends that the agency is con-
templating response actions that would exceed $2 million and 
one year and thus could only be taken with regard to listed 
sites. It is, however, not apparent from the record whether 
"joint management" necessarily entails an amendment to the 
NPL; the memorandum only speaks tersely to greater effi-
ciency in terms of "administrative, funding, staffing and en-
forcement activities." Read most favorably to EPA, the 
memorandum does not seem an act of amendment so much as 
an act of internal agency management: a proposal for a joint 
administrative approach, in which a single bureaucratic struc-
ture would oversee response activities at the Shelf and EPA's 
ongoing activities with regard to the Montrose NPL site 
itself. Even if it is not entirely clear what "joint manage-
ment" means, it is clear that under section 104(d)(4) the 
agency may treat related noncontiguous sites as one for the 
purpose of response activities, whether or not one or more of 
the sites is unlisted. See 42 U.S.C. s 9604(d)(4). Thus, the 
identification of the Shelf as the "Palos Verdes Shelf Operable 
Unit" of the "MONTROSE CHEMICAL CORPORATION 
SUPERFUND SITE," would not necessarily be as porten-
tous as Montrose would have the court believe. Nor does the 
fact that EPA may now be considering response actions at 
the Shelf that would cost more than $2 million or last more 
than one year cause the court to doubt the agency's conten-
tion that the memoranda did not put the Shelf on the NPL; 
given the current rulemaking to list the Shelf, the agency 
could reasonably consider actions it may take if the Shelf is 
eventually properly added to the NPL.8

 At the same time, EPA's characterizations of the Shelf's 
NPL status have been inconsistent, and the agency's explana-
tion at oral argument was not completely convincing. If, as 
counsel asserted, EPA had considered since 1989 that the 

__________
 8 Although EPA urges the court to stay consideration of these 
petitions for review in light of the ongoing rulemaking proceeding, 
we see no need to do so given our disposition.


Shelf was part of the Montrose NPL site and only reevaluat-
ed that view after the decision in Mead, it remains unex-
plained why the Justice Department's letter to the Ninth 
Circuit indicated that the July 1996 memoranda "expand[ed]" 
the site and why the Department did not argue in the district 
court that the Shelf was part of the Montrose NPL site.

 Even if EPA intended to promulgate a regulation through 
these memoranda, it could not, as a matter of law, have done 
so. In American Portland Cement Alliance v. EPA, the 
court looked at three criteria to determine whether certain 
"regulatory determinations" constituted regulations subject to 
review: (1) the agency's own characterization of the action; 
(2) whether the agency published such actions in the Federal 
Register or the Code of Federal Regulations; and (3) wheth-
er the action had binding effects on either private parties or 
the agency. See American Portland Cement Alliance, 101 
F.3d at 776; see also McLouth Steel Prods. Corp. v. Thomas, 
838 F.2d 1317, 1320-22 (D.C. Cir. 1988); Telecommunications 
Research & Action Ctr. v. FCC, 800 F.2d 1181, 1186 (D.C. Cir. 
1986); Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 
539 (D.C. Cir. 1986). The two internal memoranda did not 
satisfy these criteria: EPA insists that the memoranda did 
not promulgate a valid regulation; the memoranda were 
never published; and the memoranda, EPA concedes, have no 
legally binding effect on any party. Thus, EPA cannot rely 
later on the memoranda to assert that the Shelf is on the 
NPL; lest the memoranda might be interpreted to contain an 
agency decision affecting the Shelf's NPL status, we vacate 
that decision. We are, however, unpersuaded of the need to 
grant Montrose's request for an injunction or declaratory 
judgment to the effect that EPA may not exceed the one-year 
and $2 million limits except on investigative work, since those 
limits would appear to apply by default absent some new 
rulemaking placing the Shelf on the NPL or some renewed 
and prevailing claim that the 1989 Montrose NPL listing 
included the Shelf. See 42 U.S.C. s 9604(c)(1); 40 C.F.R. 
ss 300.415(b)(5), .425(b)(1). Montrose can argue this point 
when and if EPA in some later proceeding attempts to 
recover costs from the company for operations exceeding 


those limits. See 42 U.S.C. s 9607(a)(4)(A). To obtain the 
substantive effects of listing, EPA must adhere to CERCLA's 
procedures, as it appears to have recognized in initiating a 
rulemaking proceeding to add the Shelf to the NPL.9

 Of course the need to adhere to CERCLA's substantive 
and procedural requirements does not mean that EPA cannot 
address listed and unlisted sites in a coordinated fashion. 
Although Montrose apparently seeks to preclude EPA from 
administering the Shelf in conjunction with its ongoing activi-
ties with regard to the Montrose NPL site, it makes no 
persuasive legal argument why EPA could not do so, as long 
as the agency does not take any actions with regard to the 
Shelf that would require NPL listing. We are not persuaded 
that a joint management approach need have the same sub-
stantive effects as the amendment of an NPL site. Indeed, 
statutory approval of the joint management approach appears 
implicit in section 104(d) of CERCLA, which allows EPA to 
treat "two or more noncontiguous facilities"--regardless of 
listing status--"as one for purposes of" EPA's response au-
thority. 42 U.S.C. s 9604(d)(4). Given the potential increase 
in the efficiency of internal agency administration from such 
an approach, the court has no basis on which to declare joint 
management to be tantamount to amendment.

 Accordingly, until EPA, pursuant to CERCLA's rulemak-
ing procedures, properly amends the Montrose NPL site to 
include the Shelf, EPA cannot rely on the July 1996 memo-
randa to support any later claim that the Shelf is on the NPL, 
and because we conclude that the EPA memoranda did not 
constitute a "regulation" amending the NPL, we dismiss the 
petitions for lack of jurisdiction.

__________
 9 At oral argument, counsel for EPA sought to preserve the 
possibility that even though the memoranda had no effect on the 
NPL, some earlier, unidentified action of the agency may have had 
the effect of listing the Shelf. Because the petitions only sought 
review of the two memoranda, the question whether the Shelf is on 
the NPL is not before this court, only the question whether the 
memoranda put the Shelf there, which we answer in the negative.